1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT J. THOMAS, | Case No.: 13-CV-2794 YGR |
| Plaintiff, | ORDER ACCEPTING BANKRUPTCY COURT'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| WILLIAM J. DEL BIAGGIO, III, *et al.*, | |
| Defendants. | |

Now before the Court are Amended Proposed Findings of Fact and Conclusions of Law ("Proposed Findings") submitted by Bankruptcy Judge Thomas E. Carlson in this interpleader action. (Dkt. No. 1-5.) Interpleader Defendant and Cross-Defendant R. Todd Neilson, Liquidating Trustee of the Del Biaggio Liquidating Trust ("Trustee") has filed objections to the Bankruptcy Court's findings, (Dkt. No. 1-7), to which Interpleader Defendant and Third-Party/Cross-Plaintiff, Thomvest Holdings LLC, has filed a response (Dkt. No. 1-8). Pursuant to Federal Rule of Bankruptcy Procedure 9033(d), this Court has conducted a *de novo* review of the Trustee's objections and the Proposed Findings and Conclusions.

Having carefully considered the papers submitted and the record in this action, and for the reasons set forth below, the Court hereby **ACCEPTS** the Bankruptcy Court's Amended Proposed Findings of Fact and Conclusions of Law. In summary, the Court concurs that reformation of the parties' agreement to effectuate their original intent is appropriate. Consequently, the Court affirms that Trustee is not entitled to the proceeds of the warrant at issue in this action.

# I.   BACKGROUND

The facts as determined and set forth by the Bankruptcy Court are complex and largely undisputed; the core of the instant dispute concerns questions of law.  Accordingly, although the Court has independently reviewed the record in the course of conducting its *de novo* review, the facts below are derived from the Bankruptcy Judge's Amended Proposed Findings of Fact.

This interpleader action arises from a dispute concerning the ownership of a warrant for the purchase of common stock of a corporation commonly known as Serengeti (hereinafter, the "Serengeti Common Warrant").  The Serengeti Common Warrant was cashed out for $11.2 million.  Two parties claim the right to those proceeds: (a) the Trustee of the Del Biaggio bankruptcy estate; and (b) Thomvest Holdings, LLC ("Thomvest").

The instant dispute is rooted in the dot-com bust, which resulted in the winding-down of a company known as Sand Hill Capital Holdings, Inc. ("Sand Hill").  Sand Hill was an investment fund founded in the late 1990s by Debtor William Del Biaggio.  The fund made working-capital loans to start-up companies and received as consideration warrants to purchase stock of the borrowers as well as promissory notes.  Sand Hill borrowed $10 million from Thomvest, along with other sums from other vendors, in order to make working-capital loans to start-up companies in exchange for warrants to purchase stock of the borrowers or promissory notes.

Post-2000, many of Sand Hill's borrowers stopped paying their loans, which led Sand Hill to become insolvent.  In 2005, Sand Hill liquidated assets sufficient to pay off the first-priority secured debt, and had retired all but a small amount of Sand Hill's unsecured debt.  The remaining assets were thought to have little value.

Thomvest, the remaining secured creditor and shareholder, began efforts in April 2005 to close out its investment in Sand Hill, quantify its loss, and recognize that loss for tax purposes.  In an initial round of negotiations,  Del Biaggio's counsel prepared a draft Stock Purchase and Sale Agreement, under which Thomvest would transfer its shares in Sand Hill to Del Biaggio for $1.00.  The agreement, which provided that Sand Hill would retain its non-cash assets, assumed that those assets had little value.  In June of 2005, the parties circulated a second draft under which the $1.00 purchase price would be increased by any amount realized from Sand Hill assets within two years

United States District Court
Northern District of California

United States District Court
Northern District of California

1   after the sale of the shares.  Ultimately, and importantly, the Court views all these participants as

2   sophisticated business parties.  No agreement was reached.

3         In March 2006, Thomvest's view of the value of Sand Hill's remaining warrants changed

4   markedly when one of the warrants, previously thought to be worthless, proved to have significant

5   value.  More specifically, Sand Hill had obtained a warrant for the purchase of Jamba Juice stock as

6   part of a prior loan.  When Coca-Cola acquired Jamba Juice in 2006, that warrant suddenly became

7   worth $500,000.  Thereafter, Thomvest decided that it would take over all unexpired warrants and

8   apply their value to the balance of the $10 million debt that Sand Hill owed Thomvest.

9         Against this backdrop began a new round of negotiations.  Thomvest attempted to itemize

10   and value Sand Hill's warrants and other assets.  Thomvest asked Sand Hill to search its records for

11   relevant information for the purpose of valuing the amount by which Sand Hill's assets could

12   satisfy its debt to Thomvest.  Sand Hill conducted a search and provided Thomvest with its

13   certificates representing its warrants, which were stored in a fireproof safe.  The safe contained two

14   warrants for preferred shares issued by Serengeti, but not the Serengeti Common Warrant.  Sand

15   Hill had obtained that warrant as part of a workout of a loan on which Serengeti had defaulted.

16   Robert Johnson, the President of Sand Hill, testified during trial that it was likely that the Serengeti

17   Common Warrant was not found because the Sand Hill employees handling the workout had not

18   followed company procedures regarding the filing and storage of the documents involved in the

19   transaction.  Yvonne Verheij of Thomvest called the general counsel of Serengeti three times in

20   September-November 2007, trying to get information about the warrants issued by Serengeti.  Her

21   calls were never returned.  Thomvest learned later that Del Biaggio himself, purporting to act on

22   behalf of Sand Hill, probably caused Serengeti to mail copies of its financial reports to him rather

23   than to Sand Hill.

24         From August to November 2007, Thomvest and Sand Hill, though their representatives

25   Donald Butler and Robert Johnson, agreed orally in principle that Sand Hill would transfer to

26   Thomvest all assets having any potential value and that Thomvest would apply that amount against

27   the $10 million debt that Sand Hill owed Thomvest.  Thomvest would also sell its Sand Hill shares

28   to Del Biaggio.  One of Thomvest's primary objectives in with respect to closing out its interest in

Sand Hill was to claim a tax loss on its debt and equity investments in Sand Hill.  KPMG advised Thomvest on an appropriate deal structure to achieve this end, suggesting that the taxing authorities would more likely to permit a tax loss if Thomvest fully divested itself of all interest in Sand Hill by selling all its shares therein to an *unrelated third party*.  This advice was an important consideration in Thomvest's decision to sell those shares to Del Biaggio.  From his perspective, Del Biaggio was interested in obtaining Thomvest's shares of Sand Hill for two reasons.  One, Del Biaggio wanted the right to use the Sand Hill name, and two, because he had a more optimistic view than Thomvest regarding the value of some of the promissory notes still held by Sand Hill, particularly the Kiwico promissory note.

Emails from around this time confirm the various parties' intent:

(a) Butler wrote to Johnson on November 28, 2007: "Following up on our call yesterday, attached are the docs for . . . the sale of ***the remaining stock and warrants*** [of Sand Hill] to Thomvest in exchange for reduction in debt."  (Exhibit 42 (emphasis supplied).)

(b) Butler wrote the following to Del Biaggio on November 28, 2007: "[A]ttached is a copy of [the sale agreement for the Sand Hill shares] . As I'd mentioned before, we're also in the middle of doing a transaction where ***we are taking the remaining equities and warrants*** and transfer [sic] them to [Thomvest] in exchange for forgiving part of the remaining $10mm loan we had outstanding."  (Exhibit 43 (emphasis supplied).)

(c) Del Biaggio responded to Butler on November 28, 2007: "I think your proposal sounds great!!"  (Exhibit 44.)

At the time of negotiations, Butler and Johnson believed that none of the warrants owned by Sand Hill had any significant value, and that all of the assets of Sand Hill had a combined value of less than ten percent of the $10 million that Sand Hill still owed Thomvest.  Thomvest assigned a value of $788,015 to the assets it received from Sand Hill.[1]

---

[1] During these proceedings, the parties agree that the Serengeti Common Warrant had a value of no more than $880,000 as of November 30, 2007.  Thus, the total value of all Sand Hill assets, including the Serengeti Common Warrant, would have been less than 20 percent of the debt Sand Hill owed Thomvest.

The parties finalized their negotiations in November 2007, before the end of the tax year. With respect to the transfer of assets from Sand Hill to Thomvest, the terms are embodied in what the parties refer to as Agreement 1.  With respect to the sale of Sand Hill shares from Thomvest to Del Biaggio, those terms are embodied in what the parties call Agreement 2.  Agreement 1 is entitled "STOCK PURCHASE AND SALE AGREEMENT BETWEEN SAND HILL CAPITAL HOLDINGS, INC. AND THOMVEST HOLDINGS LLC."  Its essential terms are as follows:

a. The parties are Sand Hill and Thomvest.
b. The Recitals state that: (i) Sand Hill owns the cash, stocks, and warrants listed in Exhibit A, which are referred to as "the Stock"; (ii) Sand Hill owes Thomvest $10 million; and (iii) the parties agree that Sand Hill will convey "the Stock" to Thomvest in partial satisfaction of that debt.
c. Article I provides that Sand Hill transfers "the Stock" to Thomvest, and that in consideration thereof Thomvest reduces the debt owed it by $788,015.
d. Article II provides that the remainder of the $9.2 million debt is contributed to the capital of Sand Hill (*i.e.* forgiven).
e. In Article IV (a) (VI), Sand Hill represents and warrants that all of its cash, stock, and warrants are included in Exhibit A.
f. In Article V, the parties acknowledge that they are familiar with the business of Sand Hill and have received adequate  information.
g. Article VI states that the written contract constitutes the entire agreement between the parties.
h. Article XII states that the agreement is to be construed under Delaware law.
i. Exhibit A lists the following assets to be transferred to Thomvest: (A) $1.27 million cash; and (B) preferred and common stock of four companies and warrants issued by five different companies, collectively valued at $191,479. Exhibit A does not list the Serengeti Common Warrant.

Agreement 2 is entitled "SALE OF SAND HILL CAPITAL HOLDINGS, INC. FROM THOMVEST HOLDINGS LLC TO WILLIAM J. DEL BIAGGIO III."  Its essential terms are as follows:

a. The parties are Thomvest, Del Biaggio, and Sand Hill, but Sand Hill is a party only for the purpose of transferring the shares from Thomvest to Del Biaggio, and for the purpose of warranting that it owns only the assets listed on the Exhibit.
b. Article I provides that Thomvest transfers all of its 18 common and preferred shares to Del Biaggio.
c. Article II specifies that the purchase price for those shares is $1.00.  That purchase price is to be increased by any amount recovered within one year from assets listed in the Exhibit or from assets not listed in the Exhibit but "owed to,

held by, or rightfully due Sand Hill" as of the effective date of the agreement (hereinafter the Purchase Price Adjustment Clause).

d.  In Article IV(c), Thomvest, Del Biaggio, and Sand Hill warrant that all of the assets of Sand Hill are listed in the Exhibit to the agreement.

e.  Article VIII states that the written contract constitutes the entire agreement between the parties.

f.  Article XIV states that the agreement is to be construed under Delaware law.

g.  The Exhibit to the agreement identifies the "Total Assets of Sand Hill" as including only the Kiwico promissory note.

In June 2008, Del Biaggio filed a voluntary chapter 11 petition for bankruptcy. The Serengeti Common Warrant at issue here was not discovered until 2010, when Thomvest and Trustee learned that Serengeti had been acquired and a shareholder representative was trying to determine to whom the value of the warrant should be paid. Both Thomvest and Trustee claimed a right to those proceeds. The shareholder representative filed an interpleader action in the United States District Court for the Western District of Washington, which was the transferred to this district and referred to the Bankruptcy Court.

Trustee asserts ownership on the principal ground that it controls all of Sand Hill's assets and the newly-found warrant should vest to Sand Hill. Thomvest, by contrast, contends that pursuant to Agreement 1, Sand Hill transferred all its assets of value to Thomvest in partial satisfaction of is $10m debt, and that thus, the Serengeti Common Warrant should be deemed part of those assets. Trustee challenges Thomvest's current position as inconsistent with a position it asserted in the past and refers the Court to a previous dispute between the Trustee and Thomvest. There, in August 2008, Thomvest and Trustee learned that Sand Hill had recovered $32,000 that had escheated to the State of California. Trustee claimed the funds as the owner of Sand Hill. Thomvest claimed that it was entitled to the funds under the Purchase Price Adjustment Clause of Agreement 2 ("PPA Clause"), because the funds had been recovered within one year after the effective date of the agreement. Thomvest and Trustee settled the dispute by dividing the funds equally. Trustee now contends that Thomvest's previous reliance on the PPA Clause is inconsistent with its current contention that it obtained through Agreement 1 all assets of Sand Hill other than the corporate name and the Kiwico Note.

United States District Court
Northern District of California

**A.  Procedural Background**

After a two-day trial in February 2013, the Bankruptcy Court found that Sand Hill and Thomvest intended to convey all unexpired warrants, including but not limited to those enumerated on Exhibit A.  In so finding, the Bankruptcy Court identified supporting documentary and testimonial evidence.  Based thereon, the Bankruptcy Court held that Agreement 1 should be reformed to convey all unexpired warrants, including those not enumerated, to Thomvest.  Thus, the Bankruptcy Court held that the Serengeti Common Warrant properly belongs to Thomvest.

The Bankruptcy Court set forth an alternative theory upon which this Court could affirm its proposed findings and conclusions.  The Bankruptcy Court found that Agreement 1 is ambiguous as to whether it conveys all of Sand Hill warrants to Thomvest or only those warrants specifically enumerated in Exhibit A to the agreement.  (Finding ¶¶ 39-43.)  Because an ambiguity in a written contract is to be resolved by determining the intent of the parties, the Bankruptcy Court evaluated the facts and testimony of record and concluded that the intent of the parties was that all warrants, not simply those enumerated, would be transferred from Sand Hill to Thomvest and thus, that under Agreement 1, the Serengeti Common Warrant properly belongs to Thomvest.

**II.   LEGAL STANDARD**

A district court reviews *de novo* a party's objections to a bankruptcy judge's proposed findings of fact and conclusions of law.  Fed. R. Bankr. P. 9033(d).  Upon review, the court may "accept, reject, or modify the proposed findings of fact or conclusions of law" or may return the matter to the bankruptcy judge for further review.  *Id.*  Neither party disputes that the instant issue does not fall within the bankruptcy court's core jurisdiction and thus must be decided by this Court on *de novo* review.

**III.   DISCUSSION**

The Trustee has raised the following seven specific objections to the findings of fact and conclusions of law made by the Bankruptcy Court:

1.      Finding 1, as an apparent precursor to the Bankruptcy Court's "alternative theory" discussion in Findings 39-43, erroneously mischaracterizes the issue in dispute as "whether the Serengeti Common Warrant was one of the assets transferred from Sand Hill to Thomvest before Thomvest transferred its Sand Hill

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

shares to Del Biaggio." (Proposed Findings, page 3, lines 1-4.)  To the contrary, a review of the Joint Pretrial Statement (Docket No. 70), both Thomvest's and the Trustee's Trial Briefs (Docket Nos. 76 and 78, respectively) and a review of the trial transcript establish that at no time prior to or during the trial did either party contend or argue, or present evidence, that there was an ambiguity in Agreement 1 as to whether the Serengeti Common Warrant was one of the transferred assets. The sole issue in dispute, as conclusively established by said pleadings and transcript, was whether Agreement 1 should be reformed to include the Serengeti Common Warrant as a transferred asset.

2.    Findings 34 and 50(a) regarding the nature of the parties' prior agreement that Agreements 1 and 2 supposedly failed to express.  The Bankruptcy Court overly simplified the parties' agreement, and ignored uncontroverted evidence admitted at trial showing that the parties came to agreement on the specifics of the transaction that are accurately expressed in the Agreements.

3.    Findings 39-43 regarding whether Agreement 1 is ambiguous and the Bankruptcy Court's "alternative theory" supporting the recommendation that Agreement 1 be reformed.  As discussed above, this "theory" was not actually at issue, and, as discussed below, even if the theory had been before the Bankruptcy Court, it would have been untenable given the applicable law and undisputed facts.

4.    Findings 44-53 regarding whether Delaware law and the Restatement of Contracts (Second) allow reformation as a remedy when the agreement at issue expressly allocates the risk of mistake to one contracting party.  This is a pure question of law about which the Bankruptcy Court was mistaken.

5.    Findings 54 and 55 regarding whether Agreement 1 and Agreement 2 form a single integrated agreement.  The Bankruptcy Court misapplied the applicable legal standard.

6.    Findings 62-67 regarding whether Thomvest's remedy at law for breach of warranty was adequate and therefore prevented the adoption of the equitable remedy of reformation.  This is a pure question of law as to which the Bankruptcy Court erred.

7.    Finding 78 outlining the Bankruptcy Court's recommendation that Agreement 1 be reformed to transfer all of the value of the Serengeti Common Warrant to Thomvest.  The Bankruptcy Court improperly applied the relevant facts to the applicable law.

(Dkt. No. 1-7 at 5 ("Objections").)

Pursuant to Federal Rule of Bankruptcy 9033, the Court has undertaken a "de novo review upon the record ... of [the] portion of the bankruptcy judge's findings of fact or conclusions of law

United States District Court
Northern District of California

to which specific written objection has been made in accordance with this rule."  Fed. R. Bankr. P. 9033(d).  Accordingly, the Court explains below why Trustee's specific objections do not persuade, and why the Bankruptcy Court's proposed findings of fact and conclusions of law are adopted. Because the Court affirms the Bankruptcy Court on the basis of its recommendation that Agreement 1 be reformed to comport with the parties' intent, it need not, and therefore does not, address the Bankruptcy Court's alternative theory, to which objections numbers 1 and 3 are directed.

### A. Objections Nos. 2 and 5:  The nature of the parties' agreement and whether Agreements 1 and 2 are integrated.

Trustee disputes the validity of the Bankruptcy Court's factual determination that "[t]he evidence indicates that Sand Hill and Thomvest agreed that all unexpired warrants would be transferred from Sand Hill to Thomvest."  (Findings 34 and 50(a); Objection No. 1.)  Trustee contends that the evidence admitted at trial revealed that the parties' intent was more specific:  they agreed to transfer specifically listed assets, with an adjustment clause that covered the possibility that something valuable had been overlooked.  (Dkt. No. 1-7 at 23.)  Trustee then summarizes the evidence supporting the fact that the parties to Agreement 1 attempted to itemize and value all assets that would be transferred, explaining that the objective of this endeavor was to capture for Thomvest the benefit of a tax loss.  (*Id.*)

Trustee's argument fails for two reasons:  first, this Court finds, as did the Bankruptcy Court, that Agreements 1 and 2 are distinct contracts and that therefore the adjustment clause in Agreement 2 cannot bear on the interpretation of Agreement 1; and second, that the bulk of evidence adduced at trial – including testimony from the principal negotiators to Agreement 1 – established that the intent of the parties to Agreement 1 (Sand Hill and Thomvest) was to transfer all unexpired warrants.  The Court examines both in turn.

### 1. Whether Agreement 1 and Agreement 2 are integrated

In Objection Number 5, Trustee challenges the Bankruptcy Court's findings that Agreements 1 and 2 are not integrated.  (*See also* Dkt. No. 1-7 at 16-20.)  Specifically, Trustee

United States District Court
Northern District of California

1    contends that the agreements make clear on their face that they are integrated, and that testimony

2    and documentary evidence presented at trial supports this conclusion.  Trustee then undertakes to

3    recount the genesis of the agreements in their final, separate forms, and argues that under the rule

4    enunciated in *In re Gardinier, Inc.*, 831 F.2d 974, 976-77 (11th Cir. 1987), the Bankruptcy Court

5    erred in finding that the agreements were not integrated.  (Dkt. No. 1-7 at 15-19.)

6          Under Delaware law, the intention of the parties determines whether two agreements will be

7    construed as one integrated agreement.  *See e.g., Huyler's v. Ritz-Carlton Restaurant & Hotel Co.*,

8    1 F.2d 491, 492 (D. Del. 1924) (recognizing that "the principle by which instruments executed at

9    the same time, by the same parties, for the same purpose, and in the course of the same transaction

10   are considered as one, and receive the same construction as if embodied in one instrument, is of

11   wide application" and that the key principle is the "rule of construction to give effect to the intent

12   of the parties").  In order to ascertain that intent, courts often look to the factors considered by the

13   Eleventh Circuit in *In re Gardinier*, 831 F.2d 974, 978 (11th Cir. 1987).  *See In re Indian River*

14   *Homes, Inc.*, 108 B.R. 46, 49 (D. Del. 1989) (adopting *Gardinier* in a case governed by Delaware

15   law); *In re American Home Mortgage Holdings, Inc*., 402 B.R. 87, 95 (Bankr. D. Del. 2009)

16   (adopting *Gardinier* in a case governed by New York law).  The factors considered in the

17   *Gardinier* analysis are as follows: "(1) Whether the nature and purpose of the obligations are

18   different; (2) whether the consideration for the obligations is separate and distinct; and (3) whether

19   obligations of the parties are interrelated."  *In re Pollock*, 139 B.R. 938, 940-941 (B.A.P. 9th Cir.

20   1992).

21         Here, while early negotiations may have conceived a structure where one omnibus

22   agreement was to be executed, that did not occur.  Rather, ultimately, the parties chose to execute

23   two separate and distinct contracts.  Using the *Gardiner* lens, each of the three factors weigh in

24   favor of non-integration.  First, Agreements 1 and 2 are of a different nature and purpose:

25   Agreement 1 concerns the transfer of Sand Hill assets to Thomvest to retire a debt; Agreement 2

26   concerns the transfer of shares in a shell corporation to Del Biaggio, principally for the use of a

27   name, on the one hand, and to secure a position for tax relief, on the other, but only if done at arm's

28   length with an unrelated party.  (*See* Findings ¶ 55(a); Agreement 1.)  Second, the consideration

provided for each agreement was different – Del Biaggio paid a nominal sum in exchange for shares in the Sand Hill shell (literally $1.00) (Finding ¶ 55(d); Agreement 2 at 1); Thomvest received what the parties believed were all of Sand Hill's valuable assets and in return, cancelled a $10m debt (Findings ¶ 55(d); Agreement 1 at 1-3, Ex. A).  Third, the parties' obligations are not interrelated.  Agreement 1 contemplates that Sand Hill would transfer its valuable assets to Thomvest, an obligation that exists separately from the obligations set forth in Agreement 2.  Del Biaggio had no obligations under Agreement 1 and was not a party to Agreement 1.  Indeed, apart from the fact that logically, Agreement 1 had to be signed by Sand Hill before Thomvest would sign Agreement 2, there is no interrelatedness of obligations under the two separate, distinct agreements.  (Findings ¶ 55(b), (e), (f).)

Trustee's recitation of record facts to suggest that integration is proper does not persuade. Indeed, such evidence also supports the opposite conclusion: that the use of one integrated agreement was *not* viable and the use of two distinct contracts was an intentional choice based on the parties' understanding of the rights and obligations under each agreement.  Moreover, the fact that the execution of the two agreements would result in a tax benefit for Thomvest does not itself compel the result Trustee seeks, for that fact alone cannot establish that the *Gardiner* factors are met.

Based on the *Gardiner* analysis, the Court concludes that Agreements 1 and 2 should not be viewed as integrated.  Based on this threshold issue, the Trustee's argument that the Purchase Price Adjustment  ("PPA") Clause in Agreement 2 would apply to the interpretation of Agreement 1 fails.[2]

## 2.  Whether the parties to Agreement 1 intended to transfer all warrants to Thomvest

In his Second Objection, Trustee contends that the parties did not intend to transfer all Sand Hill assets of value to Thomvest generally.  Rather, Trustee argues that the parties' agreement was

---

[2] Nevertheless, as set forth in Section III(B) below, even *if* the agreements were held to be integrated, the PPA Clause would not preclude reformation of the contract to transfer the Serengeti Common Warrant to Thomvest.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   more specific: "to transfer unexpired warrants of value or potential value to Thomvest, to assign a

2   value to them, and then to use that value to recognize a tax loss through a subsequent third party

3   sale to Del Biaggio." (Dkt. No. 1-7 at 24-25.)  The Bankruptcy Court found that the parties' intent

4   was to transfer all remaining assets of value to Thomvest in satisfaction of Sand Hill's debt to

5   Thomvest.  The Court agrees.

6        Ample record evidence supports this conclusion.  First, testimony from the principals of

7   Sand Hill and Thomvest advised that in oral conversations in the weeks before Agreement 1 was

8   drafted and signed, Donald Butler for Thomvest and Robert Johnson for Sand Hill agreed that Sand

9   Hill would transfer all assets having any potential value to Thomvest in partial satisfaction of Sand

10  Hill's $10 million debt to Thomvest.  (Findings ¶ 34(a); Tr. 42:1-11; 57:13-26.)  In addition, the

11  parties understood that all assets of value would be transferred from Sand Hill to Thomvest; the

12  only assets that would remain with Sand Hill was the Kiwico promissory note, which was thought

13  to be valueless.  Had the Serengeti Common Warrant been located, it would have been included in

14  Agreement 1.  (*See* Tr. 65; 191.)

15       Second, contemporaneous documentary evidence also confirms this intention.  (*See*

16  Findings ¶¶ 20, 23, 34, 35; Tr. Ex. 42, 43, 44; Tr. 42:1-11; 42:22-43:17; 47:23-48:6; 64:28-65:26.)

17  That the parties intended for Sand Hill to transfer all assets of value, including Serengeti warrants,

18  makes sense given the fact that Sand Hill owed Thomvest $10 million, a debt that was secured by

19  all assets of Sand Hill.  In partial satisfaction of that debt, all assets of value would transfer to

20  Thomvest.  Accordingly, assets of potential value were intended to be included in Agreement 1.

21       Third, the language in Agreement 1 itself further confirms that the parties intended that all

22  assets of Sand Hill were to be transferred in Agreement 1.  (Agreement 1, Section IV(a)(vi).)

23  Record evidence cited by Trustee does not compel a different result.  Even the language in

24  Agreement 2 confirms that the Kiwico promissory note was the only asset Sand Hill still retained as

25  of the time Del Biaggio received those shares.  Furthermore, two days before signature on

26  Agreement 2, Butler emailed Del Biaggio stating "we are taking the remaining equities and

27  warrants and transfer[ing] them to [Thomvest] in exchange for forgiving a part of the remaining

28  $10mm loan," to which Del Biaggio responded "I think your proposal sounds great!!" (Tr. Ex. 43,

1   44.)  The weight of evidence of record – documentary and testimonial – confirms, as does logic,

2   that the parties intended for all warrants to transfer.

3          To the extent that not all warrants were itemized in Exhibit A, neither party to Agreement 1

4   knew that was the case or intended for that to be so.  Thus, the Bankruptcy Court found that to the

5   extent that the language of Agreement 1 provides that the only warrants conveyed from Sand Hill

6   to Thomvest are those listed in Exhibit A, Agreement 1 "fails accurately to embody the agreement

7   actually reached between Sand Hill and Thomvest.  The agreement reached by those parties would

8   be reflected accurately if the written contract were reformed to convey to Thomvest all warrants

9   owned by Sand Hill, *including* those listed in Exhibit A."  (Findings ¶ 35.[3])

10         Trustee's argument that the parties' intent was more specific: "to transfer unexpired

11  warrants of value or potential value to Thomvest, to assign a value to them, and then to use that

12  value to recognize a tax loss through a subsequent third party sale to Del Biaggio," does not

13  persuade.  (Dkt. No. 1-7 at 24-25.)  The claim is entirely inconsistent with the parties'

14  contemporaneous actions, which reflected the parties' shared intent that all assets of value,

15  including all warrants owned by Sand Hill, would be transferred to Thomvest and were undertaken

16  as a means of effectuating that shared intent.  The parties' intent led them to assign values to the

17  warrants that the parties believed, mistakenly, constituted the entirety of Sand Hill's assets.

18  Yvonne Verheij's testimony, upon which Trustee relies, is not to the contrary.  (*See* Dkt. No. 1-7 at

19  17; 24-25.)  That value, again based on the shared intent and the parties' mistaken belief that they

20  had accounted for all of Sand Hill's warrants, was then used in Thomvest's tax loss calculation.

21  Such actions do not demonstrate that the parties intended anything but that Sand Hill would transfer

22  all valuable assets, including all warranties, to Thomvest.

23         For these reasons, Trustee's second and fifth objections are denied.  The Bankruptcy

24  Court's findings on these points are accepted.

25

26

27

28  _____
    [3] The Court notes that in Trustee's listed Specific Objections to the Proposed Findings, Trustee has
    not objected to Finding 35.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.   Objection No. 4:  Whether the parties allocated the risk of mistake to one contracting party, and if so, whether reformation is available.**

Trustee's fourth objection – that reformation is not available where one party has borne the risk of loss – relies principally on the question of whether Agreements 1 and 2 form one integrated agreement.  Trustee's position is that the agreements should be construed as one, and that the risk of loss provision found in Agreement 2 bears on the interpretation of Agreement 1.  Having found that Agreements 1 and 2 are not integrated for the reasons stated above, Trustee's fourth objection necessarily collapses into a contention that the interpretation of Agreement 1 is dependent upon the interpretation of terms set forth in the separate, distinct Agreement 2.  Such position is intuitively unpersuasive.  Nonetheless, the Court has evaluated this argument and the Bankruptcy Court's determinations, and affirms the Bankruptcy Court's findings.

Trustee argues that even if the agreements are not integrated, the reformation of Agreement 1 would render the PPA Clause in Agreement 2 meaningless, and that for this reason reformation of Agreement 1 is foreclosed.  (Dkt. No. 1-7 at 21.)  The practical and logical import of Trustee's position is not clear.  No suggestion has been made that Del Biaggio did not receive the benefit of his bargain, or that Agreement 2 does not accurately memorialize the parties' intent.  Del Biaggio paid $1.00.  In return he received the right to use the Sand Hill name and the Kiwico Note.

Trustee's cited authority for his claims are misguided.  None of these cases stand for the proposition that a separate and distinct agreement must bear on the interpretation of another separate and distinct agreement specifically where, as here, the parties to the agreements are different.  (*See id.*)  Trustee's argument also fails on a factual level.  Regardless of whether reformation is possible as to Agreement 1 (to give effect to the intent of Sand Hill and Thomvest), the PPA Clause still operated separately under Agreement 2 to preserve for Thomvest any unexpected value in the one asset that was retained by Sand Hill when Thomvest transferred the Sand Hill shell to Del Biaggio, specifically the Kiwico promissory note.  Indeed, Robert Johnson testified at trial and explained that the PPA Clause was intended to cover the possibility that there would be payments on the Kiwico loan, or any other loan payments received by Sand Hill following the sale.  (Tr. 184:6-185:9.)  Thus, it is false as a factual matter that interpreting each

14

United States District Court
Northern District of California

agreement separately on its own terms would render a provision in one agreement meaningless. Trustee's fourth objection is thus denied.

Even if the Agreements were found to be integrated, however, Trustee's argument that the risk of mistake provision under the Restatement (Second) of Contracts precludes reformation does not persuade. The Bankruptcy Court considered this precise question and asked each party to fully brief this issue, and further invited the parties to submit cases in support of their positions. Trustee now argues, as it did before the Bankruptcy Court, that Restatement of Contracts Section 154's rules regarding assumption of risk act as a bar to reformation under Section 155 allowing for reformation based on a mistake of both parties. The Court disagrees.

Sentences cannot be cherry-picked out of the Restatement and analyzed in a vacuum. Chapter 6 of the Restatement (2d) of Contracts addresses the issue of "mistake" in Sections 151-158. The Introductory Note provides an important context for understanding the objectives at issue in these Sections:

> The law of contracts supports the finality of transactions lest justifiable expectations be disappointed. This Chapter deals with exceptional situations in which the law departs from this policy favoring finality and allows either avoidance or reformation on the ground of mistake. As § 151 makes clear, the word "mistake" is here used to refer to a belief that is not in accord with existing facts, rather than to an act that is the result of such an erroneous belief.
>
> ***
>
> The basic rule for mistake of both parties as to expression is stated in § 155. It allows reformation where the parties are mistaken in thinking that a writing correctly expresses an agreement that they have previously reached. Avoidance is not an appropriate remedy where the mistake can be corrected by reformation.
>
> ***
>
> The rules governing all of the situations dealt with in this Chapter have traditionally been marked by flexibility and have conferred considerable discretion on the court. In part, this has been due to the protean character of the situations involved and the circumstance that they are almost inevitably unforeseen by the parties. In part it has

been due to the fact that the law of mistake was shaped largely by
courts of equity which had broad discretionary powers.

Restatement (Second) of Contracts 6 Intro. Note (1981).  Section 154 merely extends and
memorializes those discretionary, equitable powers of the Court to include situations where
evidence exists that parties to an agreement actually intended to allocate risk.  No persuasive
evidence exists here that the parties to Agreement 1 intended to allocate the risk that certain
warrants of potential value would be overlooked.  Indeed, the weight of evidence supports the
Courts finding that the parties intended to transfer all such warrants and believed, mistakenly, that
Agreement 1 and Exhibit A thereto effectuated that intent.

The interplay between Sections 152, 153, 154, and 155 of the Restatement can be cleanly
delineated.  The official Comments to Section 154 of the Restatement, which sets forth the rule
governing when a party bears the risk of a mistake, specify that "the rule stated in this section
determines whether a party bears the risk of a mistake for the purposes of both §§ 152 [When
Mistake of Both Parties Makes a Contract Voidable] and 153 [When Mistake of One Party Makes a
Contract Voidable]."  Restatement (Second) of Contracts § 154 (1981).  Section 152 and 153
address whether rescission or avoidance of a contract is available based on mistake.  Not
surprisingly, no such cross-reference exists for Section 155, which governs reformation.
Restatement Section 155 provides: "where a writing that evidences or embodies an agreement in
whole or in part fails to express the agreement because of a mistake of both parties as to the
contents or effect of the writing, the court may at the request of a party reform the writing to
express the agreement, except to the extent that rights of third parties such as good faith purchasers
for value will be unfairly affected."  Restatement (Second) of Contracts, § 155 (1981).

As the Bankruptcy Court noted, the comments to Section 154 only reference application to
Sections 152 and 153.  In those sections, a party seeks to rescind or avoid the contract at issue in its
entirety.  There is no mutual view that the contract should be reformed to reflect more accurately
the parties' intentions.  Rather, one party is attempting to enforce, and the other is attempting to
avoid, the obligations set forth in the contract at issue.  Under Section 154, courts can deny a
party's attempt to avoid their contractual obligations.  Restatement (Second) of Contracts, §§ 152,

United States District Court
Northern District of California

153 (1981).  Such discussion is not relevant where the contract fails to memorialize the entirety of the parties' intentions.  Where, as here, such circumstances exist, reformation is appropriate.

Thus, the Court agrees that that the risk allocation between the parties is relevant only in determining whether a party should be able to avoid its contractual obligations or whether the party who determined to bear the risk should be held to his burden.  The rule does not extend to the instance of mutual mistake where both parties wish to give effect to a contract that fails to embody accurately the terms upon which the contracting parties agreed.  (*See* Finding 20; Tr. 41:1-11, 47:23-48:6, 57:13-26, 63:4-23; 69:15-22; 189:15-190:12; 199:19-200:4; Tr. Ex. 42, 43, 44.)

In an attempt to show that Sections 154 and 155 operate together in reformation cases and therefore that the allocation of the risk of mistake bars reformation, Trustee cites two cases from Delaware.  Both are from Delaware Family Court and are unpersuasive here.  In *Emma J.G. v. Richard A.G.*, 1984 WL 53294 (Del. Fam. Ct. Sept. 6, 1984), an unpublished opinion totaling three pages, the Family Court expressly stated that the factual predicates for reformation were not present in the case (specifically, a shared understanding with respect to the way in which the written agreement differed materially from the parties' intended agreement) and that it was "without question" that there had been an allocation of risk.  *Id.* at *2 ("[A]ny mistake here is certainly not "mutual" in nature.").  Thus, the Family Court had no occasion to fully consider whether, if sufficient facts had been proffered to support reformation, it would be barred by the allocation of risk principle in Section 154.  *Id.*  Second, Trustee relies on *M.C.S. v. R.C.S.*, *Jr.*, 2006 WL 3197370 (Del. Fam. Ct., Aug. 3, 2006), another unpublished opinion totaling five pages.  There, too, the Family Court concluded that there was no mutual mistake of fact that could function as a predicate for reformation.  *Id*. at *5.  Indeed, Trustee's reliance on the language in *M.C.S.* that in order for a contract to be reformed "the party adversely affected [must not have] assumed the risk of the mistake," is misplaced.  The case the Family Court was citing for that language, *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348 (Del.Ch. June 6, 2006) (internal citations omitted), was concerned with rescission, not reformation.  *Id.* at *8 ("A claim of rescission based on a mutual mistake of fact requires proof that 1) both parties were mistaken as to a basic assumption, 2) the

United States District Court
Northern District of California

17

mistake materially affects the agreed upon exchange of performances and 3) the party adversely affected did not assume the risk of the mistake.").

Due to the paucity of Delaware state cases to support its position, Trustee goes on to cite three cases from other jurisdictions.  None are persuasive, for all are either distinguishable on their facts or do not offer reasoned analysis of the question presented here.  In *Hankins Const. Co. v. United States*, 838 F.2d 1194 (Fed. Cir. 1988), the Federal Circuit did not find that the parties had entered into a written agreement that did not embody the terms of their actual agreement and thus did not squarely confront the question raised by the Trustee: whether, if factual predicates are established to justify reformation, the allocation of risk principle in Section 154 precludes reformation.  Instead, the court relied on Section § 154(b), noting that a "party bears the risk of a mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient....").  *Id*. at 1196.  That circumstance is not present here.  In addition, although the Federal Circuit mentioned the term "reformation," nowhere did it refer to Section 155, nor did it examine the "reformation" referenced such that this Court has the benefit of any reasoned analysis on the instant question.  In *Dairyland Power Co-op. v. United States*, 27 Fed. Cl. 805 (Fed. Cl. 1993), the plaintiff appeared to be arguing for rescission, not reformation.  *Id*. at 811.  Furthermore, the claims court found that there was no mutual mistake of fact.  Thus, there was no factual support for reformation in the first instance; the discussion of whether the allocation of risk principle bars reformation did not form the basis of that court's decision, nor is it controlling on this Court.  *Id*. at 813.  In fact, the court first found the claims barred by an executed release, and thus the analysis that follows – whether reformation or rescission was appropriate – is in effect an alternative holding.  *Id*. at 811.  Finally, Trustee cites *Hall Contracting Corp. v. Entergy Servs., Inc.*, 309 F.3d 468 (8th Cir. 2002).  But there, the court found that the evidence of a mutual mistake "must be clear and convincing before reformation is justified" and that the plaintiff's "evidence on this point is not clear and convincing."  *Id*. at 475 (citation omitted).  The *Hall* court then went on to assess whether the contract would nonetheless be "voidable," and its further analysis sounds in Sections 152 and 154, which concern whether mutual mistake renders a contract voidable, not Section 155

18

1    reformation.  Thus, it did not squarely address the question whether, if there had been clear and

2    convincing evidence that the parties' mutual intent had not been embodied in their written

3    agreement, reformation would be available to give effect to their true intentions.

4         The purpose of reformation is to give effect to contracting parties' intentions when, having

5    reached an agreement and having then attempted to reduce it to writing, the parties fail to express it

6    correctly in the writing.  Restatement (Second) of Contracts § 155, Cmt. A (1981).  In such an

7    instance, logic does not counsel that their intent be frustrated where there is an allocation of the risk

8    of mistake, for in such instances, the parties to the agreement both agree that a particular provision

9    of the contract must be reformed to give effect to their shared intent.  Thus, where, as here, the

10   parties agree that the agreement fails to capture accurately their intent and clear and convincing

11   evidence supports that conclusion, reformation is appropriate.

12        For these reasons, Trustee's fourth objection is overruled.

13        ### C. Objection No. 6:  Whether the Bankruptcy Court should have rejected the equitable remedy of reformation because Thomvest had an adequate remedy at law.

14

15        In its Amended Proposed Findings of Fact and Conclusions of Law, the Bankruptcy Court

16   determined that Thomvest did not have an adequate remedy at law, thereby avoiding the need to

17   determine whether, if such remedy existed, Thomvest would be limited to legal relief.  The court

18   based its finding on the fact that in a legal action for breach of contract, Thomvest could recover no

19   more than $880,000; if the equitable remedy of reformation applied, Thomvest could recover the

20   entire $11.2 million.  (Findings ¶ 66.)  The Bankruptcy Court thus determined that the disparity in

21   recovery rendered the legal remedy inadequate.  (*See id.*)

22        Trustee argues that reformation is improper here because under Delaware law, contract

23   reformation is not available where the party seeking to reform the contract has an adequate remedy

24   at law under the terms of the existing contract.  Trustee contends that Thomvest in fact had an

25   adequate remedy at law.  Specifically, Trustee asserts that Thomvest had a cause of action for

26   breach of the express warranty in section IV(a) of Agreement 1 that "(vi) The total Sand Hill Stock

27   [defined to include warrants] as of the Effective Date is set forth in Exhibit A [to Agreement 1 ]"

28   (the "Sand Hill Stock Warranty").  In opposition, Thomvest argues that no legal action is available

United States District Court
Northern District of California

19

because the contract does not contain a relevant express warranty, and that moreover, any legal action would not afford complete legal relief because the money damages amount would reflect only the value of the warrant as of the date of sale and would fail to capture the futures interest inherent in the warrant after the date of sale.

The Bankruptcy Court rejected Trustee's argument because it found that the dollar value associated with the breach of warranty claim (stipulated to be no more than $880,000) made the remedy inadequate because the value of the warrant rose in the years following the agreement to $11.2 million.  (Findings ¶ 66.)  Trustee contends that this was error because Delaware law states that no equitable remedy, such as reformation of a contract, can be granted where an adequate remedy at law exists.

The Court agrees with the Bankruptcy Court.  Absent reformation, Thomvest would lack an adequate, complete legal remedy.  Accordingly, the Court need not reach the question of whether, if an adequate legal remedy were available, Thomvest must seek that remedy in lieu of equitable reformation.

First, the Court agrees that the terms of Agreement 1, as stated, and without reformation, do not technically allow for a breach of warranty claim.  Given the language of the agreement, Sand Hill did not provide a warranty that it had transferred all its stocks and warrants to Thomvest. Rather, in the recitals, Sand Hill confirmed to be the owner of certain assets listed in Exhibit A: "Sand Hill is the owner of the cash, stocks, and warrants listed in Exhibit A ("Stock")." (Agreement 1, ¶ A.)  Then, using that defined term, "Stock," it merely "warranted" that the "Stock" as defined by Exhibit A was listed in Exhibit A: "(vi) the total Sand Hill Stock as of the effective date is set forth in Exhibit A, attached hereto."  (Agreement 1, § IV(a)(vi).)  Sand Hill did not warrant that any and all "cash, stocks, and warrants" were listed in Exhibit A.  That the document as executed does not provide for an express warranty on this issue may have been a side effect of the speed with which the deal closed or the result of poor drafting.  Regardless, this fact provides further evidence that Agreement 1 does not memorialize accurately the intentions of the parties.

Second, legal damages are inadequate here because unique property is at issue.  *See U. S. Dimension Products, Inc. v. Tassette, Inc.*, 290 A.2d 634, 635 (Del. 1972) (finding equitable

United States District Court
Northern District of California

United States District Court
Northern District of California

1  remedy of specific performance "was justified in [an] unusual situation because the stock [at issue

2  in the case] was 'investment' stock which could not be sold for a period of several years, [...] which

3  made difficult any ascertainment of its value.").  The Serengeti Common Warrant represented a

4  futures interest, a unique right to purchase stock in Serengeti that could not be purchased on the

5  open market, and a *future value* dependent upon the performance on Serengeti.  The result is that

6  although the Serengeti Common Warrant was valued at $880,000 on the date that Sand Hill assets

7  were transferred to Thomvest, that fact is of little import in ascertaining the amount of damages

8  Thomvest sustained by not having been transferred the Warrant's unique right to purchase stock as

9  of November 2007.  The static $880,000 valuation from that time does not reflect the value of the

10  Warrant at any other time or what its value might have been at any point if Thomvest had elected to

11  exercise its rights and cashed it in.  The damages available from a legal action would be incapable

12  of adequately accounting for the unique nature of the Warrant and its potential to change in value

13  markedly over time – which facts did indeed occur and increased the Warrant's value

14  monumentally.

15      Third, it is undisputed that the value of the warrant is currently $11.2 million; far more than

16  the amount available even if Thomvest could pursue legal action.  Thus, the legal action would

17  permit Thomvest to recover roughly 8% of the current value of the warrant.  This serves as another

18  consideration in the Court's analysis, although it is not accorded dispositive weight.

19      For these reasons, the Court finds that a legal action would fail to afford Thomvest relief

20  qualifying as "complete, practical, and efficient to the ends of justice and its prompt administration

21  as the equitable remedy."  *Theis v. Bd. of Educ.*, 2000 WL 341061, *2 (Del. Ch. Mar. 17, 2000).

22  Thus, the Bankruptcy Court's findings that there was no adequate legal remedy are adopted,

23  incorporating the above additional analysis.

### D.  Objection No. 7:  Whether Agreement 1 should be reformed to transfer all warrants including the Serengeti Common Warrant to Thomvest.

26      Trustee's seventh, and final, objection concerns whether the bankruptcy court's ultimate

27  recommendation – to reform Agreement 1 to include transfer of all warrants, including the

28  Serengeti Common Warrant, or in the alternative, to construe Agreement 1 to effect the same end –

was in error.  As set forth above, the Court finds Trustee's other objections unavailing and that abundant record evidence establishes that the intention of the parties was to transfer all warrants. Accordingly, the Court deems that Agreement 1 should be reformed to reflect that all warrants owned by Sand Hill are transferred to Thomvest, including the Serengeti Common Warrant.

## IV.     CONCLUSION

For the reasons set forth above, Trustee's Objections are overruled.  The Bankruptcy Court's recommendations, with the exception of its alternative theory (*see* Findings ¶¶ 39-43), are accepted.

This terminates Docket No. 1.

**IT IS SO ORDERED**.

Date: **August 11, 2014**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California